**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No: 21-2689
_____

SASINTHA MARIYANAYAGAM,
                                        Petitioner

v.

ATTORNEY GENERAL UNITED STATES OF AMERICA
_____

On Petition for Review of an Order of the
Board of Immigration Appeals
(BIA 1:A208-094-425)
Immigration Judge: Dinesh C. Verma
_____

Submitted Under Third Circuit L.A.R. 34.1(a)
April 13, 2022

Before:   AMBRO, JORDAN and SCIRICA, *Circuit Judges*

(Filed: April 15, 2022)
_____

OPINION*
_____

---

* This disposition is not an opinion of the full court and, pursuant to I.O.P. 5.7, does not constitute binding precedent.

JORDAN, *Circuit Judge*.

Petitioner, Sasintha Mariyanayagam, is a native of Sri Lanka and citizen of the United Kingdom. She entered the United States in 2014 under the Visa Waiver Program and applied for asylum, withholding of removal, and protection under the Convention Against Torture ("CAT"). An Immigration Judge denied Mariyanayagam's applications, holding that she had not established a nexus between her alleged persecution and any statutorily protected ground. Likewise, he determined that Mariyanayagam was not eligible for protection under the CAT because the record evidence did not show she would be tortured by or with the acquiescence of a public official in the United Kingdom. Her appeal was dismissed by the Board of Immigration Appeals for largely the same reasons. We will deny her petition for review.

## I.    BACKGROUND[1]

In 2003, Mariyanayagam married a man living in the United Kingdom in a match her parents had arranged. She joined her husband in London the next year. Her husband was physically abusive, but she never reported his abuse to British authorities because of the social opprobrium she feared from her Sri Lankan community. Mariyanayagam ultimately separated from her husband because, as she put it, she "was not given any womanly rights[.]"  (A.R. at 108-09.)  She last saw him in 2005, and their divorce was finalized in 2008.

---

[1] These background facts are drawn from the administrative record and are accepted as true for purposes of this decision.

2

In 2010, Mariyanayagam's parents again arranged for her to be married, this time to a man living in Switzerland.  Although she moved from London to Switzerland to be with him after their engagement, she often traveled back and forth between the two locations for extended periods due to her work.  During one of her stays in Switzerland, she became pregnant. Her partner, angered by that news, physically abused her and demanded that she return to London to have the baby without his financial support.  She did that and gave birth to her daughter.  Mariyanayagam and her baby stayed in London with friends for another four to five months.  Eventually, she brought her daughter back to Switzerland, where she and her partner got married and lived together for another two years.

During that period, Mariyanayagam's second husband was often abusive toward her and, at one point, threatened to kill her.  He would beat her for many reasons, including jealousy over her prior marriage, anger over the small size of her dowry, and irritation with their crying child.  When she refused to have intimate relations with him, he would force himself upon her.  Mariyanayagam never reported him to the authorities.

Eventually, he sent her to the United States, where she joined her family.  She says she did not go back to London because her first husband still lived there and she would be "ostracized by [her] society."  (A.R. at 236.)  After she had spent two weeks in the United States, Mariyanayagam's second husband stopped contacting her or her daughter.  Although she has yet to receive official divorce papers, she learned that he remarried a year later.

Around the time of his remarriage, Mariyanayagam applied for asylum, humanitarian asylum, withholding of removal, and protection under the CAT. She alleged persecution by her second husband on account of her political opinion that she should be treated as an equal. She also claimed membership in two particular social groups ("PSGs"): her family and "married women who are unable to leave a relationship due to cultural and societal factors." (A.R. at 65.)

The IJ denied the applications in their entirety. He determined that Mariyanayagam suffered past persecution but failed to establish a nexus to a statutorily protected ground. He also expressed doubt that her second proposed group was cognizable but held that, even if it was, she was not a member of that group because she had left both of her husbands. Moreover, he rejected her humanitarian asylum claim because she failed to show a likelihood of harm if she returned to the United Kingdom. Similarly, he denied CAT protection because Mariyanayagam could not show that, if she returned to the United Kingdom, it was more likely than not that the British government would torture her or acquiesce to her torture by others. The BIA dismissed her appeal, agreeing in whole with the findings and reasoning of the IJ. It added only that it doubted she expressed any political opinion at all, because "her actions opposing her former partners" showed no more than "an interest in removing herself from an unacceptable situation[.]" (A.R. at 4.)

4

## II.    DISCUSSION[2]

Mariyanayagam argues that the IJ and BIA erred on multiple fronts.  First, she contends that she was subject to persecution because she expressed the political opinion that her second husband should have treated her as an equal.  Next, she argues her family was another cause of her second husband's persecution.  She also contends that she is indeed a member of her second proposed PSG because, although she traveled freely, she did so as a married woman, and now, as a divorcee, she would be "socially ostracized" by her community if she returned to the United Kingdom.  (Opening Br. at 13.)  And lastly, she argues she is entitled to CAT protection because of "the mental torture and the cultural and social aspects attendant to her claim[,]" which the "British police [are] not in [a] position to prevent[.]"  (Opening Br. at 21, 24.)

None of those contentions is persuasive.  While it is undisputed that Mariyanayagam was the victim of domestic abuse, she has not shown entitlement to relief under our immigration laws.  She has failed to establish a nexus between her alleged

---

[2] "[A] denial of a [Visa Waiver Program] applicant's petition for asylum, withholding of removal, and relief under the CAT constitutes 'a final order of removal' within the meaning of the statute, as the alien is entitled to no further process before deportation." *Shehu v. Att'y Gen.*, 482 F.3d 652, 656 (3d Cir. 2007) (citing 8 U.S.C. § 1252(a)(1) and 8 C.F.R. § 217.4(a)(1)).  We have jurisdiction over appeals from final orders of removal pursuant to 8 U.S.C. § 1252(a)(1).  We review questions of law de novo. *B.C. v. Att'y Gen.*, 12 F.4th 306, 313 (3d Cir. 2021).  We review factual findings "to ensure that they are supported by substantial evidence from the record considered as a whole, and we will reverse based on a factual error only if any reasonable fact-finder would be 'compelled to conclude otherwise.'" *Huang v. Att'y Gen.*, 620 F.3d 372, 379 (3d Cir. 2010) (citation omitted) (quoting 8 U.S.C. § 1252(b)(4)(B)).  "Inasmuch as the BIA adopted and affirmed the IJ's decisions and orders as well as making an independent analysis, we review both the IJ's and the BIA's decisions and orders." *Ordonez-Tevalan v. Att'y Gen.*, 837 F.3d 331, 340-41 (3d Cir. 2016).

persecution, past or future, and a statutorily protected ground, which defeats her claims to asylum and withholding of removal. Moreover, she mistakenly asks that we equate social shame within a certain ethnic community to torture acquiesced in by British authorities, so her CAT claim is meritless.

First, to establish asylum eligibility, petitioners must show they are "'unable or unwilling to return to' their home country 'because of [past] persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion.'" *Nsimba v. Att'y Gen.*, 21 F.4th 244, 247 (3d Cir. 2021) (quoting 8 U.S.C. §§ 1101(a)(42)(A), 1158(b)(1)(B)). Past persecution requires a petitioner to show (i) that she was "targeted for mistreatment on account of one of the statutorily-protected grounds, (ii) that the incident, or incidents, of mistreatment rise to the level of persecution, and (iii) that the persecution was committed by the government or forces the government is either unable or unwilling to control." *Doe v. Att'y Gen.*, 956 F.3d 135, 141-42 (3d Cir. 2020) (citations and internal quotation marks omitted). "A showing of past persecution gives rise to a rebuttable presumption of a well-founded fear of future persecution." *Toure v. Att'y Gen.*, 443 F.3d 310, 317 (3d Cir. 2006) (citing 8 C.F.R. § 208.13(b)(1)). If the petitioner did not suffer past persecution, she may still be eligible for relief upon a showing of "a 'reasonable possibility' of future persecution on account of a protected ground." *Thayalan v. Att'y Gen.*, 997 F.3d 132, 138 (3d Cir. 2021) (citation omitted). Regardless of whether that persecution occurred in the past or may occur in the future, the protected ground on account of which the petitioner is persecuted must be "a motivating factor or 'at least one central reason'" why

6

she was or may be targeted. *Doe*, 956 F.3d at 142 (citation omitted). In other words, there must be a nexus between the protected ground and the persecution.

Substantial evidence supports the IJ's finding that Mariyanayagam was not targeted on account of a statutorily protected ground. We therefore cannot disagree with the BIA's conclusion that she failed to establish that "her former partners imputed any political opinion to her, or that [their] motive[s] for harming her w[ere] based on any imputed or actual political opinion that she held." (A.R. at 4.) The evidence is sufficient to support a finding that the cause of the abuse was, sadly and simply, her husband's anger over her pregnancy, her dowry, and other marital concerns.

Her proposed PSGs of family membership and "married women who are unable to leave a relationship due to cultural and societal factors"[3] do not aid her cause. (A.R. at 65.) There is no basis for saying her family was a central reason she was persecuted. And as a married woman who traveled freely and who successfully left both husbands – though it may be argued that her second husband abandoned her – she was never a member of her second proposed PSG.[4]

---

[3] Although we doubt that this is a cognizable PSG, we assume without deciding, as did the IJ and BIA, that it is.

[4] We decline to entertain Mariyanayagam's belated attempt to redefine that PSG on appeal as that of divorcees who face shame from their cultural community. She did not delineate that PSG to the IJ and, thus, cannot change the formulation now. *See Matter of W-Y-C- & H-O-B-*, 27 I. & N. Dec. 189, 191 (BIA 2018) ("Where, as here, an applicant delineates a social group for the first time on appeal, the Immigration Judge will not have had an opportunity to make relevant factual findings, which we cannot do in the first instance on appeal.").

Even if Mariyanayagam had shown a nexus to a statutorily protected ground, she admits that she never went to the British authorities for help, and thus she has not presented any evidence that the United Kingdom's government "either committed the persecution or was unable or unwilling to control the persecutor[.]" *Nsimba*, 21 F.4th at 247-48. So, her asylum claim was properly dismissed. And, "[s]ince the threshold for asylum is lower than for protection under the withholding of removal … provision[], rejection of [Mariyanayagam's] asylum claims necessarily require[d] that [her] … withholding claim[] be rejected as well." *Yu v. Att'y Gen.*, 513 F.3d 346, 349 (3d Cir. 2008).

Her CAT claim, too, is untenable. "For an act to constitute torture under the [CAT] … it must be: (1) an act causing severe physical or mental pain or suffering; (2) intentionally inflicted; (3) for an illicit or proscribed purpose; (4) by or at the instigation of or with the consent or acquiescence of a public official who has custody or physical control of the victim; and (5) not arising from lawful sanctions." *Myrie v. Att'y Gen.*, 855 F.3d 509, 515 (3d Cir. 2017) (quoting *Auguste v. Ridge*, 395 F.3d 123, 151 (3d Cir. 2005)) (alteration in original). Setting aside the other requirements, there is no evidence that British authorities would acquiesce in, much less participate in or instigate, anything resembling torture. Nor is the United Kingdom responsible for policing Mariyanayagam's ostracization from her community. Her CAT claim thus stands on even weaker grounds than do the others.

**III.    CONCLUSION**

Mariyanayagam has not met her burden of proof for asylum, withholding of removal, or CAT protection, and we will therefore deny her petition for review.