**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 21-3036
_____

FRANCISCO ALBERTO MATOS-ALMONTE,
Petitioner

v.

ATTORNEY GENERAL UNITED STATES OF AMERICA
_____

On Petition for Review of an Order of the
Board of Immigration Appeals
(Agency No. A062-737-285)
Immigration Judge: Alice Song Hartye
_____

Submitted Pursuant to Third Circuit L.A.R. 34.1(a)
July 8, 2022

Before: GREENAWAY, JR., PORTER and NYGAARD, <u>Circuit</u> <u>Judges</u>

(Opinion filed August 2, 2022)
_____

OPINION[*]
_____

PER CURIAM

---

[*] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

Francisco Alberto Matos-Almonte, proceeding pro se, petitions for review of a final order of removal issued by the Board of Immigration Appeals ("BIA"). For the reasons stated below, we will deny the petition.

I.

Matos-Almonte is a citizen of the Dominican Republic who entered the United States in 2012. He was later convicted of conspiracy with intent to distribute one kilogram or more of heroin in violation of 21 U.S.C. § 846 and sentenced to 48 months' incarceration. Based on that conviction, the Department of Homeland Security charged Matos-Almonte with being removable for having been convicted of an aggravated felony, see 8 U.S.C. §§ 1227(a)(2)(A)(iii), 1101(a)(43)(B) & (U), and a controlled substance offense, see 8 U.S.C. § 1227(a)(2)(B)(i). Matos-Almonte, proceeding pro se, appeared before the Immigration Judge ("IJ"), admitted the allegations in the notice to appear, and conceded the charges of removability. He applied for asylum, withholding of removal, and protection under the Convention Against Torture ("CAT").

Following a hearing, the IJ concluded that Matos-Almonte was ineligible for asylum and withholding of removal because of his criminal conviction, and that he failed to demonstrate entitlement to relief under CAT. Matos-Almonte appealed, and the BIA adopted and affirmed the IJ's decision. Matos-Almonte filed a timely petition for review.

II.

We have jurisdiction pursuant to 8 U.S.C. § 1252(a)(1). Because the BIA affirmed and adopted the IJ's opinion, we review both the IJ's and the BIA's opinions. See Ordonez-Tevalan v. Att'y Gen., 837 F.3d 331, 340-41 (3d Cir. 2016). We review

2

legal conclusions de novo, Singh v. Att'y Gen., 677 F.3d 503, 508 (3d Cir. 2012), and we review the agency's findings of fact in denying CAT relief under the substantial-evidence standard pursuant to which such findings "are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary," Nasrallah v. Barr, 140 S. Ct. 1683, 1692 (2020) (citation and internal quotation marks omitted).

III.

Matos-Almonte does not contest the determination that he is ineligible for asylum and withholding of removal due to his criminal conviction; rather, he argues that the agency erred in concluding that he was not entitled to relief under CAT. To obtain CAT relief, Matos-Almonte was required to demonstrate, through objective evidence, "that it is more likely than not" that he will be tortured if removed. See 8 C.F.R. §§ 1208.16(c)(2), 1208.17(a); Sevoian v. Ashcroft, 290 F.3d 166, 175 (3d Cir. 2002). The determination as to whether Matos-Almonte met his burden involves the two-fold inquiry set forth in Myrie v. Attorney General, 855 F.3d 509, 516 (3d Cir. 2017): (1) "whether an applicant has met the burden of establishing that it is more likely than not [that he] would be tortured if removed"; and (2) "whether public officials will acquiesce in the likely treatment." Quinteros v. Att'y Gen., 945 F.3d 772, 786 (3d Cir. 2019) (citation and internal quotation marks omitted). In deciding whether an applicant meets the first part of this standard, "the IJ must ask (1) what is likely to happen to the [applicant] if removed and (2) whether what is likely to happen amounts to torture." Guzman Orellana v. Att'y Gen., 956 F.3d 171, 181 (3d Cir. 2020). As for the second prong, the IJ must first "make[] a factual finding . . . as to how public officials will likely act in response to the

3

harm the petitioner fears," and next "assess[] whether the likely response from public officials qualifies as acquiescence under the governing regulations." Myrie, 855 F.3d at 516. Under both prongs, the first inquiry is factual, while the second is legal. Id.

Matos-Almonte has argued that he fears torture from two sources if he returns to the Dominican Republic. First, he testified that he was shot in the foot by a member of the "42 Gang" when he was a teenager and may be targeted by the gang again. He also testified to fearing reprisal from the individual who supplied him with the drugs that were seized when he was arrested. According to Matos-Almonte, he owes this individual, Simone Medina, $52,000 for the seized heroin, and Medina and an associate of his known as "The Surgeon" have threatened Matos-Almonte and his family. Matos-Almonte also testified to believing that Medina learned of his efforts to cooperate with the prosecution in his criminal case. According to Matos-Almonte, The Surgeon and Medina (who is apparently a resident of the United States and the Dominican Republic) have taken actions such as visiting his former home in New Jersey, sending threatening text messages to his wife, telling Matos-Almonte's cousin that they will kill Matos-Almonte because of the money he owes, and visiting his grandmother's home in the Dominican Republic threatening consequences if Matos-Almonte does not pay Medina. Matos-Almonte contended that his family reported threats to the police in the Dominican Republic but that the police did not do anything. He also testified to being told that

Medina is a well-connected politician, though he had not personally verified this information.[1]

The IJ reasoned that Matos-Almonte's testimony was credible but, applying the framework described in Myrie, concluded that he failed to establish that he would more likely than not be tortured if he returns to the Dominican Republic. Although Matos-Almonte clearly fears returning to his country, the evidence, viewed objectively, does not compel a conclusion different from that reached by the agency. First, the incident Matos-Almonte described with the 42 Gang was an isolated one that occurred many years ago. And regarding the threats from Medina and The Surgeon, Matos-Almonte did not describe any encounters with them or threats since early 2020 and, as the IJ noted, even assuming that Medina and his associates remain interested in Matos-Almonte, it is not clear that Medina will know if Matos-Almonte returns to the Dominican Republic and will be able to locate and harm him upon his return. While some record evidence may work against this conclusion—for example, country statistics indicating that the Dominican Republic is a small country—we cannot say that the record *compels* a different one. Moreover, although Medina and his associates apparently threatened Matos-Almonte's grandmother in the Dominican Republic, telling her to vacate her home if Matos-Almonte did not pay Medina, Matos-Almonte testified that his grandmother has

___

[1] We note that Matos-Almonte seemingly submitted various documents in support of his claims for the first time to the BIA. These documents included statements from friends attesting to his good character and papers the contents of which he testified about at his hearing. The BIA did not consider whether a remand to the IJ was warranted. However, as Matos-Almonte has not raised this issue in his brief, it has been forfeited. See M.S. by & through Hall v. Susquehanna Twp. Sch. Dist., 969 F.3d 120, 124 n.2 (3d Cir. 2020).

not vacated her home and has not been harmed, nor has she been threatened for some time. Finally, Matos-Almonte testified that he knew Medina from his hometown and that it was there that Medina had made his threats, and in his brief to the BIA, he characterized Medina and The Surgeon as "'thugs' not sophisticated criminal[s]." A.R. at 11. In light of these considerations, it was reasonable for the agency to conclude that Matos-Almonte's apparent ability to relocate to an area of the country, away from his hometown, in which Medina could not locate or harm him undermined his claim. See 8 C.F.R. § 1208.16(c)(3)(ii); see also Tamang v. Holder, 598 F.3d 1083, 1095 (9th Cir. 2010) (noting that "evidence of relevant country conditions is extremely important, as is the ability of [the applicant] to safely relocate to another part of his country of origin").

The agency also reasonably concluded that Matos-Almonte failed to show government acquiescence. As the IJ noted, Matos-Almonte's testimony indicates that he could report any future threats from Medina to police and seek protection, if necessary, as he and his family have done in the past. Cf. Galeas Figueroa v. Att'y Gen., 998 F.3d 77, 93 (3d Cir. 2021) (concluding that record supported a similar conclusion as to the Honduran government). Although, as the IJ noted, the record indicates that there is corruption in the Dominican Republic, the evidence also supports its conclusion that the country has a functioning law enforcement department and a mechanism to report crimes. Finally, although Matos-Almonte has argued that he had heard that Medina is a politician, he also testified before the IJ that he had not independently verified this information. Thus, the IJ's conclusion about how the government would likely respond was also supported by substantial evidence. And, as a matter of law, "a government that

6

investigates reports of private violence is not willfully blind to that violence."  Id.

We will accordingly deny the petition for review.